# BACHNER & ASSOCIATES, P.C.
### ATTORNEYS AT LAW
### 39 BROADWAY
### SUITE 1610
### NEW YORK, NEW YORK 10006

TELEPHONE: (212) 344-7778
FACSIMILE: (212) 344-7774

MICHAEL F. BACHNER*

HOWARD WEINER**

*ALSO ADMITTED IN NJ
**ALSO ADMITTED IN CALIFORNIA AND NJ

www.bhlawfirm.com
www.bachnerlaw.com

NEW JERSEY OFFICE
175 FAIRFIELD AVENUE
SUITE 3D
WEST CALDWELL, N.J. 07006
TEL: (973) 403-9550

September 12, 2019

**VIA ECF**
Hon. Lorna G. Schofield
United States District Court Judge
Southern District of New York
40 Foley Square
New York, NY 10007

*Re:*   *United States v. Menachem Abramov, et. al.* **17Cr. 262 (LGS)**

Dear Judge Schofield:

As directed in your Honor's Order dated July 2, 2019, Menachem Abramov respectfully submits the following response to the Government's letter dated September 5, 2019, in which they posit that Mr. Abramov's sentencing guidelines should be calculated based upon the totality of the diamond merchants losses -- $13,431,825.00 – resulting from the purchases made in India from March 2016 through July 2016. Mr. Abramov disagrees and argues that his losses should be limited to the diamonds Stud Masters acquired in June 2016 in the amount of approximately $1.97 million.

## II.    Abramov Did Not Join the Conspiracy Until June 2016

At the outset, is clear that in conspiracy cases, a defendant's relevant conduct does not include the conduct of others occurring before the defendant joined the conspiracy. *See* §1B1.3, cmt. (n.4); *see also* U.S.S.G. app. C. amend 503 ("a defendant may not be held responsible for his co-conspirators' conduct before he joined the conspiracy, even if he knew about the conduct") *United States v. Rodriguez*, 2016 WL 3248499 (S.D.N.Y. June 13, 2016), citing U.S.S.G. app. C amend. 503). For this reason, the Government's analysis is flawed.

In its submission, the Government improperly included losses for conduct which were not (i) within the scope of the jointly undertaken criminal activity, (ii) in furtherance of that criminal activity, and (iii) not reasonably foreseeable to Mr. Abramov. U.S.S.G. § 1B1.3(a)(1)(B).

BACHNER & ASSOCIATES, P.C.

According to the evidence at trial, Abramov first became involved in the Indian transactions in March 2016 when Foozailov asked him to accompany Mullakandov to India to appraise diamonds. At that time, however, the testimony established that Abramov was not part of a conspiracy to obtain diamonds on credit not intending to pay for them. Indeed, according to Mullakandov, he understood at that time from Foozailov only that the plan was to make it appear that Stud Masters was an independent company so that he could obtain more diamonds on credit. (Tr. 421). Thereafter, Abramov was called into the meeting and told that his function was to appraise the diamonds. Once they were obtained, the diamonds would be brought to Foozailov's office in New York where they would be sold. (Tr. 423-424). There was no discussion about absconding with the diamonds without payment. Indeed, notably absent from the Government's analysis is Mullakandov's testimony that in March 2016, when Mr. Abramov accompanied him to India for the first time, even Mullakandov believed that the transactions were legitimate and that the Indian merchants were going to be fully paid for their merchandise. (Tr. 626). The Government also fails to address Mullakandov's testimony that after the May trip to India, he was in Las Vegas in a hotel with Mr. Abramov and Muratov. There, Muratov confronted Mullakandov claiming that he had figured out there was a scheme to steal the diamonds. Muratov demanded to be compensated going forward or he would notify law enforcement. Mr. Abramov was alleged to be present at the time. Clearly then, according to the Government's own witness, both Muratov and Mr. Abramov were unaware of the scheme to steal diamonds until their last trip to India in July. Mr. Abramov's conduct cited to by the Government at page 2 of its letter, all occurring before the third trip, is of no consequence since it was not part of a conspiracy to steal diamonds from the merchants purchased by the defendants on credit. Therefore, the loss figure of $13,431,825 should be reduced by $3,979,161.75 ($457,843.12 losses in March and $3,521,318.65 in May) totaling $9,452,664.00. If the analysis ended here, based only upon the amount of loss, Mr. Abramov's offense level would increase by 18 levels pursuant to § 2B1.1(b)(1)(J) rather than the 20 levels which the Government is seeking pursuant to § 2B1.1(b)(1)(K).

However, there is reason to decrease the loss offense level further.

In *United States v. Studley*, 47 F.3d 569, 574 (2d Cir. 1995), the Second Circuit held that a district court must make two particularized findings in order to hold a defendant accountable for the acts of others for sentencing purposes: (1) the acts were within the scope of the criminal activity agreed upon by the defendant, and (2) the acts were reasonably foreseeable in connection with that criminal activity. *Id.*; *See, e.g. United States v. Khandrius*, 613 Fed. Appx. 4, 7 (2d Cir. 2015) (summary order); *United States v. Brown*, 279 Fed. Appx. 63, 65 (2d Cir. 2008) (summary order); *United States v. Johnson*, 378 F. 3d 230, 238 (2d Cir. 2004); *United States v. Rigo*, 2017 WL 2123064 at *3 (S.D.N.Y. 2017). That burden is on the Government. *See United States v. Rizzo*, 349 F.3d 94, 99 (2d Cir. 2003); *Khandrius*, 613 Fed. Appx at 8. Because the scope of criminal activity jointly undertaken by the defendant is not necessarily the same as the scope of the entire conspiracy, the court must first determine the scope of the criminal activity that the particular defendant agreed to jointly undertake *before* proceeding to the issue of foreseeability. *U.S. v. Allen*, 644 F. Supp. 2d 422, 429 (S.D.N.Y. 2009) (emphasis added); *See also Studley*, 47 F. 3d at 573 ("the first question for a court applying this section is whether the defendant participated in jointly undertaken criminal activity.").

BACHNER & ASSOCIATES, P.C.

In *Studley,* the Second Circuit identified several factors relevant to determining the scope of the defendant's agreement: (1) "whether the participants pool[ed] their profits and resources, or whether they work[ed] independently"; (2) "whether the defendant assisted in designing *and* executing the illegal scheme"; and (3) "what role the defendant agreed to play in the operation, either by an explicit agreement or implicitly by his conduct." *Studley*, 47 F.3d at 575. The trial evidence established that Abramov does not meet these criteria and argues that he should be held responsible under *Studley*, solely for the diamonds he personally purchased in July 2016 as an agent of Stud Masters - totaling $about 1.97 million – resulting in an increase of 16 levels for the amount of loss pursuant to § 2B1.1(b)(1)(I).

### A. Abramov Did Not Pool his Profits Nor Resources Into the Success of the Operation and Therefore Worked Independently.

The first *Studley* factor that a court considers in determining the scope of defendant's agreement is "whether the participants pool[ed] their profits and resources, or whether they work[ed] independently." *Id.* In *Studley*, the Court found that the defendant had not pooled his resources with the other telemarketers despite sharing the same office space, as the office space was provided by the leader of the scam; therefore the telemarketers had in no way "pooled" resources as they did not contribute anything of their own to the scheme itself. *Id.* at 576. Similar to *Studley*, there is no evidence here that Mr. Abramov pooled his resources with his co-defendants. First, the trial evidence established that Foozailov and Itzchaki provided the office space for Stud Masters (Tr. 426); the Stud Masters account was set up by Foozailov and Mullakandov and Abramov was not a signatory on the Stud Masters account and had no access to it (Tr. 422-424; 626); and Mullakandov acquired the telephone number for Stud Master and he carried that phone (Tr. 428; 574). Of course, Mr. Abramov's company was paid $1,500 by Mullakandov on a Stud Masters check for his efforts in March. (Tr. 429; 628-29). The trial evidence simply does not demonstrate that Mr. Abramov was participating in the profits of the other conspirators or that the profits were being pooled. On the contrary, Mr. Abramov was supposed to be paid a commission solely on the diamonds he sold. (Tr. 452-453). Mullakandov's testimony that Mr. Abramov and Muratov refused to return certain diamonds to Mullakandov claiming they had not been paid adequately for their work. (Tr. 587-88). Clearly, if profits were being pooled, there would have been no need for this conduct.

Thus, this criterion has not been satisfied. See *Khandrius, supra,* (remanded for resentencing in light of *Studley* factors where, *inter alia,* the defendant's pay was not "tied directly" to the activities of the other conspirators and he did not share in the profits." *Id.* at. 8.)

### B. Abramov Did Not Assist in Designing the Illegal Scheme

The second factor identified by the *Studley* Court in determining the scope of the defendant's agreement is "whether the defendant assisted in designing *and* executing the illegal scheme." *Id.* at 575. As stated above, the government's evidence confirms that it was Foozailov who designed the scheme. Mr. Abramov was recruited into the scheme after the plan was established, and was hired to act as an appraiser.

Even if Abramov became aware of the scheme later on, it is crucial that "[t]he scope of conduct for which a defendant can be held accountable under the sentencing guidelines is significantly

BACHNER & ASSOCIATES, P.C.

narrower than the conduct embraced by the law of conspiracy." *Rigo*, 2017 WL 2123064 at *3, and that "important participation in one aspect of a conspiracy with awareness of others does not necessarily establish responsibility for the whole of the conspiracy's activities." *Khandrius*, 613 Fed. Appx. at 7. In *Khandrius*, the defendant posed as a doctor within a clinic that carried out a scheme to commit health care fraud and pay health care kickbacks. *Id.* Relying on defendant's awareness of the scope of the conspiracy and his interest in getting paid by the clinic, the district court concluded that the entire intended loss of $77.5 million was properly attributable to him. *Id.* The Second Circuit vacated the sentence, and held that the defendant's role within the scheme, despite it being of considerable importance to the success of the operation, was insufficient to hold the defendant responsible for the entire conspiracy. *Id.* The Court cautioned that a court should not give "undue weight" to a defendant's knowledge of the fraud, since, citing *Studley*, "'knowledge of another participant's criminal acts,' nor 'awareness of the scope of the overall operation' alone is enough to deem the defendant responsible for the acts of co-conspirators.'" *Khandrius*, 613 Fed. Appx. at 7. Here, like the defendants in *Studley and Khandrius,* Abramov was hired and paid as an employee with a limited and distinct purpose. His later awareness of the scheme does not make him responsible for the entire loss amount generated by the others.

### C. Abramov's Role In The Scheme Was Limited

The third factor assessed in determining the scope of the defendant's agreement is the role that the defendant agreed to play within the operation, either explicitly or implicitly. *Studley*, 47 F.3d at 575. To determine the scope of the criminal activity that a particular defendant agreed to jointly undertake, a court must discern "the scope of the specific conduct and objectives embraced by the defendant's agreement." *Rigo*, 2017 WL 2123064 at *4. (quoting U.S.S.G. §1B1.3 cmt. n. 2). In the instant case, Abramov agreed to act as an appraiser for Stud Masters and to hold Stud Masters out as a separate entity so that Stud Masters could acquire more diamonds on credit. The acts of the others, even if known or reasonably foreseeable to the defendant, are not relevant conduct for sentencing purposes. *Id.*, citing U.S.S.G. §1B1.3 cmt. n. 3(B). *See also Allen*, 644 F. Supp. 2d at 429 (stating that the extent to which members of a criminal conspiracy agreed to undertake the illegal activity of the entire organization can be a difficult issue; a defendant's knowledge of another's criminal acts is not enough to hold the defendant liable nor is the scope of the overall operation determinative of the defendant's culpability).

### Conclusion

Despite Mr. Abramov's conviction for conspiracy, the law requires more to hold him responsible for sentencing purposes for the acts of the others. Notably, in regard to the sentencing of other more culpable defendants in this case, such as Natanzon, the Government and Probation correctly limited the loss calculation and did not seek to hold those defendants responsible for the losses generated by the entire conspiracy. Mr. Abramov asks that the law be applied equally to him.

Respectfully submitted,

Michael Bachner

MFB/cc